United States District Court
Southern District of Texas
**ENTERED**
May 10, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

JORGE L ROSALES, §
§
     Plaintiff, §
§
VS. § CIVIL ACTION NO. 2:17-CV-224
§
NANCY A BERRYHILL, §
§
     Defendant. §

## MEMORANDUM AND RECOMMENDATION

Jorge L. Rosales filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security (Commissioner) for the purpose of receiving Disability Income Benefits (DIB) and Social Security Disability Insurance (SSDI). Plaintiff filed a motion and brief in support of his application on October 18, 2017 and Defendant filed a response brief in support of the Commissioner's determination on November 17, 2017 (D.E. 11, 12). For the reasons discussed below, it is respectfully recommended that the Commissioner's decision be vacated and Plaintiff's cause of action be remanded to the Social Security Administration for further consideration.

## BACKGROUND

Plaintiff filed an application for SSDI on December 10, 2014 and an application for DIB on December 23, 2014, alleging an onset date of November 25, 2014 (Tr. 274-275, 268-273, 128; D.E. 9-7 at pp. 8-8, 2-7; D.E. 9-5 at p. 4). The applications were denied at all levels of the administrative process (Tr. 192-197, 202-205, 19-39, 1-4; D.E.

9-6 at pp. 6-11, 16-19; D.E. 9-3 at pp. 20-40, 2-5 ).  Plaintiff filed this civil action seeking

reversal of the administrative law judge (ALJ) decision on June 23, 2017 (D.E. 1).

Plaintiff alleges that he has been unable to work since November 25, 2014 because

of polymyositis,[1] depression, and anxiety (Tr. 318; D.E. 9-8 at p. 28).   His reported

symptoms include fatigue, constant muscle weakness and pain, loss of grip strength, bent

fingers, diarrhea, constipation, abdominal bloating, and social isolation (Tr. 326, 333,

348, 355; D.E. 9-8 at pp. 36, 43, 58, 65).  Prior to the onset of his disability, Plaintiff

worked as a truck driver, heavy equipment operator, and doing manual labor (Tr. 295,

375; D.E. 9-8 at pp. 5, 85).

### MEDICAL EVIDENCE

In September 2012, Plaintiff was diagnosed with polymyositis following a biopsy

of the muscles in both legs.   He had been experiencing constant muscle pain and

weakness.   He was unable to close his hands and could not grip a can opener, open a

bottle, or lift anything.  He was having trouble getting up off the toilet and difficulty with

chewing and swallowing.   He also had symptoms of Raynaud's syndrome where his

hands would get cold and turn blue.[2]   He was taking Levothyroxine, Tramadol,

---

[1] Polymyositis is an uncommon inflammatory disease that causes muscle weakness
affecting both sides of the body.  Having the condition can make it difficult to climb
stairs, rise from a seated position, lift objects, or reach overhead.  The muscle weakness
associated with polymyositis involves the muscles closest to the trunk, such as those in
the hips, thighs, shoulders, upper arms, and neck. The weakness tends to gradually
worsen. https://www.mayoclinic.org/diseases-conditions/polymyositis/symptoms-
causes/syc-20353208 (last viewed May 4, 2018).

[2] Raynaud's Syndrome causes some areas of the body such as fingers and toes to feel
numb and cold in response to cold temperatures or stress.  Smaller arteries that supply
blood to the skin narrow, limiting blood circulation to affected area.

Naproxen, and a multivitamin (Tr. 390-392; D.E. 9-9 at pp. 8-10).   In October 2012 Plaintiff reported that he felt better and could move more easily.   He was taking Prednisone 30 mg., Methotrexate, Folic Acid, and Flomax.   In November 2012 he was prescribed Xanax (Tr. 394; D.E. 9-9 at p. 12).   In December 2012 the Prednisone was decreased to 10 mg. (Tr. 421 (Tr. 9-9 at p. 39).

In November 2014 Plaintiff went to the emergency room complaining of body numbness, itching, and tingling (Tr. 433; D.E. 9-9 at p. 51).   Plaintiff was seen at a community health center in December 2014 and reported that the numbness in his face was better.   He reported a history of thyroid problems but was having no symptoms related to his thyroid.   He had been a heavy drinker until 2012 when he stopped drinking after his polymyositis diagnosis.   He was taking Prednisone 2.5 mg. per day.   He had contractures in his hand and the skin on his hands was smooth and shiny with cracking on the tips of his fingers.   His Prednisone was increased to 5 mg. per day.   He also was taking Vitamin B12 and Folate (Tr. 448-450; D.E. 9-9 at pp. 66-68).

On February 16, 2015 Plaintiff saw a licensed clinical psychologist for a clinical interview with mental status examination.   Plaintiff reported that he had weakness all over his body and tended to drop things.   He usually saw a rheumatologist for the condition but could not afford to see one at that time.   He also had a history of anemia and thyroid problems (Tr. 451; D.E. 9-9 at p. 69).

---

https://www.mayoclinic.org/diseases-conditions/raynauds-disease/symptoms-causes/syc-20363571 (last viewed May 4, 2018).

Plaintiff felt anxious, especially around people, and avoided social settings when possible.  He did not like standing in lines, became nervous in traffic, and did not like visitors at his home.  He had anxiety about not doing things around the house and had to check the locks on doors and make sure he did not leave the stove or oven on.  He had a compulsion to count the rooms in his house repeatedly and in a certain order.  He would not iron clothing because he was afraid of leaving the iron on and starting a fire.  On the day of the appointment it took him twenty minutes to leave the house because he repeatedly had to count the rooms, count the things in his pockets, and make sure the lights were off and the doors were locked (Tr. 451-452; D.E. 9-9 at pp. 69-70).

He had panic attacks with nausea, an increased heart rate, and sweating.  He could not remember a time when he was happy.  He did not have relationships and did not like people to get close to him.  He felt depressed, hopeless, worthless, and as if he had never accomplished anything.  He had many regrets and felt frustrated and worried all the time.  Cleaning and organizing his house made him feel better.  He had stopped taking Xanax because he was worried about the side effects and had not participated in other mental health treatment.  When he worked, he was usually alone or with a small group of people working in a rural setting.  He stopped working in January 2012 when his symptoms worsened and his anxiety increased (Tr. 452; D.E. 9-9 at p. 70).

He managed his own hygiene and grooming, but had trouble with his grip, causing him to drop things and have a hard time opening jars.  He cleaned house, but would get frustrated because he tired easily.  He went to the store at less crowded times and primarily ate microwavable food.  A family member mowed his yard.  He managed his

4 / 25

own money, but was compelled to continually check the bills and his accounts for fear he had made a mistake.  Plaintiff mostly stayed home and, with the exception of his cousin's husband who lived across the street, did not like anyone to visit him.  He had some suicidal thoughts but had never attempted suicide (Tr. 452-453; D.E. 9-9 at pp. 70-71).

Plaintiff completed the tasks on the mental status examination in a timely manner, although he tended to be impatient with directions.  His thought processes were organized and goal-directed with no evidence of tangential or circumstantial thinking.  He had a history of alcohol abuse, but had stopped drinking three years previously.  He was very preoccupied in his thinking with various compulsive behaviors such as counting and organization and appeared preoccupied with his health issues.  He reported no history of auditory or visual hallucinations and there was no evidence of delusional thoughts.  His mood was anxious and depressed and his affect was constricted. His sensorium and cognition, memory, concentration, judgment, and insight were within normal limits  (Tr. 453-454; D.E. 9-9 at pp. 71-72).

The psychologist diagnosed Plaintiff with social anxiety disorder, agoraphobia with panic attacks, unspecified obsessive-compulsive and related disorder, major depressive disorder, recurrent, moderate, and a history of alcohol use disorder.  His prognosis was guarded because he was not participating in mental health treatment and his agoraphobia and social anxiety largely restricted him from leaving home.  He also engaged in compulsive behaviors (Tr. 454; D.E. 9-9 at p. 72).

Regarding Plaintiff's functional capacity, the psychologist opined that he could understand, recall, and complete one- to two-step directions as well as multi-step,

complex directions.  He appeared capable of sustaining concentration in a work setting but it was suspected his concentrative abilities would decrease once his anxiety level increased.  He was likely to have marked difficulties interacting with supervisors, coworkers, and the public on a regular basis.  He also would have limitations in his ability to adjust to and manage work stress (Tr. 454-455; D.E. 9-9 at pp. 72-73).

Plaintiff underwent a consultative internal medical examination by Jerry Liles, D.O., on March 17, 2015.  He reported generalized muscle pain and a cold feeling in his hands and feet, especially during cold weather.  He was taking Prednisone intermittently and Aleve for pain.  He could walk about one block before becoming tired and having his feet hurt.  He could sit or stand for thirty minutes before his legs or feet hurt.  He could handle three to five pounds with either hand secondary to poor grip strength (Tr. 460; D.E. 9-9 at p. 78).  Plaintiff's examination was normal except for decreased grip strength and decreased range of motion.  He also had muscle contractures of both hands involving the left and right fifth fingers, with -20 degrees of extension on the right and -15 on the left.  Dr. Liles believed that Plaintiff would be able to do only sedentary type work which would not involve lifting heavy objects and would have difficulty grasping objects (Tr. 461-462; D.E. 9-9 at pp. 79-80).

Plaintiff saw Gail Hirschfield, M.D., in May 2015 and complained of constant fatigue, muscle weakness, aching feet, and pharyngitis.  The fatigue was associated with a change in his sleep cycle and generalized weakness (Tr. 473; D.E. 9-10 at p. 6).  Dr. Hirschfield described Plaintiff as chronically ill appearing with abnormal facies.  He had Raynaud's Syndrome and mild contractures with moderate pain in both hands when he

moved them.  She wanted Plaintiff to see a neurologist and have lab work done but he could not afford to do so (Tr. 474-475; D.E. 9-10 at pp. 7-8).

Dr. Hirschfield completed a form entitled "Medical Opinion Re: Ability to Do Physical Activities" on August 2, 2015.  She said that Plaintiff could walk less than a block without rest, sit and stand for fifteen minutes at a time, lift less than ten pounds, and could not grasp, turn, or twist objects, use his fingers for fine manipulation, or reach overhead.  She did not believe Plaintiff could work (Tr. 485-487; D.E. 9-10 at pp. 18-20).

In August 2015 Plaintiff presented to Dr. Hirschfield with arthralgia, back pain, fatigue, headache, muscle ache, and nausea, with the symptoms aggravated by exercise, exertion, pain, and stress.  The pain was a constant aching aggravated by cold weather and relieved by over-the-counter naproxen sodium and rest.  He had decreased mobility, joint instability, joint tenderness, locking, nocturnal pain, malaise, and weakness.  He had been taking Prednisone most of his adult life and felt better taking 5 mg. rather than 2.5 mg. (Tr. 508; D.E. 9-10 at p. 41).  He had proximal muscle weakness in his upper extremities and subtle muscle wasting was noted (Tr. 510; D.E. 9-10 at p. 43).

In September 2015 Plaintiff saw Dr. Hirschfield complaining of anxiety, which occurred three times per week.  He had anxious and fearful thoughts, a depressed mood, difficulty concentrating, excessive worry, fatigue, racing thoughts, and restlessness.  The anxiety was exacerbated by social interaction.  He had tried Wellbutrin but did not like it (Tr. 512-516; D.E. 9-10 at pp. 45-49).  In October 2015 Plaintiff continued to complain of the same anxiety symptoms (Tr. 529; D.E. 9-10 at p. 62).  In January 2016 he reported that his anxiety symptoms had improved, although he was easily startled and worried

excessively (Tr. 533; D.E. 9-10 at p. 66).  Dr. Hirschfield noted that Plaintiff may have had the start of "moon face." (Tr. 535; D.E. 9-10 at p. 68).

In May 2016 Plaintiff reported a persistent dry cough along with fatigue, nasal congestion, post nasal drainage, and weight loss.  He reported that he had been to another clinic where he was diagnosed with pneumonia and prescribed Levaquin (Tr. 543; D.E. 9-10 at p. 76).  In May 2016 Plaintiff reported that his cough was better, but he was having shortness of breath and his chest was sore (Tr. 549; D.E. 9-10 at p. 82).  In June 2016 he was still having shortness of breath and cough on an intermittent basis (Tr. 556; D.E. 9-10 at p. 89).

## HEARING TESTIMONY

Plaintiff, represented by counsel, attended a hearing on July 26, 2016.[3]  He was forty-six years old and had obtained a high school diploma (Tr. 91; D.E. 9-4 at p. 5).  He had stopped working because of pain and stiffness in his shoulders, hands, and legs that made it difficult to get in and out of a vehicle.  His hands were stiff and he had trouble with his grip.  He could hold a glass or bottle of water, but some days he had trouble opening things and his hands were cracked.  Some of his fingers had started to bend.  He could button a shirt with difficulty and open a bottle, but had a tool to help him open jars (Tr. 95-96; D.E. 9-4 at pp. 9-10).

His main problem was lack of strength and the fact that he was always sore.  He had to use both hands to hold a gallon of milk because he did not have much strength in

---

[3] Plaintiff also had attended a hearing on June 5, 2014, apparently as part of an earlier application.  The transcript of that hearing is located at Tr. 64-87 (D.E. 9-3 at pp. 65-88).

his shoulders.  He could not push himself up because his arms were too weak.  He could reach overhead, but not with weight.  He tired after approximately ten minutes of walking and could not get up and down from a squatting position.  He also needed to change position after approximately ten minutes of sitting (Tr. 96-97; D.E. 9-4 at pp. 10-11).

He suffered from anxiety and was very anti-social.  He left the house only every few days to go to the grocery store or the post office and tried to do everything in the morning when places were less crowded.  He had friends but did not visit them because he was not comfortable around people and had panic attacks when he was around them.  He spent his days watching television and reading.  One friend visited every two or three weeks for approximately thirty minutes (Tr. 98-99; D.E. 9-4 at pp. 12-13).

He stopped working because he had trouble walking, although he did not need to use a cane or a walker.  He also had trouble breathing, which he believed was caused by the polymyositis, and difficulty swallowing.  He had been treated for pneumonia and still had a cough and shortness of breath (Tr. 99-100; D.E. 9-4 at pp. 13-14).

The medical expert (ME) testified that Plaintiff did not meet a listing for an impairment and could do a full range of sedentary work (Tr. 91; D.E. 9-4 at p. 5).  Although Plaintiff testified about having pneumonia and swallowing difficulties, the ME did not see evidence of that in the record.  Although he had been treated for hypothyroidism,  he was not on any medication for that condition.  The only restriction on sedentary work would be that he should not work outside (Tr. 102; D.E. 9-4 at p. 16).  The record did show that in 2012 he had difficulty swallowing, was unable to open

bottles, and had difficulty chewing, but he was treated with Methotrexate and Prednisone at that time (Tr. 102-103; D.E. 9-4 at pp. 16-17).

The ME discounted Dr. Liles's finding that Plaintiff had decreased range of motion and grip strength with generalized myalgia and muscle contractures of both hands by saying he was describing fasciculations (Tr. 103-104; D.E. 9-4 at pp. 17-18). The ME thought Dr. Liles's findings on the consultative examination were inconsistent with the clinic notes by his regular physicians (Tr. 105; D.E. 9-4 at p. 19). With regard to consultative examinations, the ME had difficulty crediting a finding of reduced grip strength based on one visit where the patient was asked to grasp the doctor's fingers. The ME believed that a person might not put in an effort to grip strongly on the test (Tr. 109; D.E. 9-4 at p. 23).

The ME testified that Dr. Hirschfield noted the muscle contractures at the distal digits, but the ME did not see any fasciculations[4] described (Tr. 105; D.E. 9-4 at p. 19). The ME did not think Plaintiff would have trouble grasping because the contractures were at the distal phalangeal joints (Tr. 106-109; D.E. 9-4 at pp. 20-23). Also, the ME did not believe that Dr. Hirschfield's conclusions regarding Plaintiff's abilities were supported by her clinic notes (Tr. 110-111; D.E. 9-4 at pp. 24-25). Nor did the ME see evidence that Plaintiff had not improved since 2012 following treatment with Methotrexate and steroids (Tr. 111; D.E. 9-4 at p. 25).

---

[4] Fasciculations are involuntary rapid muscle twitches that are too weak to move a limb but are easily felt by patients and seen or palpated by clinicians. https://www.sciencedirect.com/topics/neuroscience/fasciculation (last viewed May 9, 2018).

A psychologist also testified as a medical expert (PME).  He summarized the records from the psychological consultative examination and concluded that Plaintiff did not meet a listing for a mental impairment.  He would need to avoid contact with the public, coworkers, and supervisors and would need to be in a low stress environment (Tr. 115; D.E. 9-4 at p. 29).  If he had issues involving repetitive behaviors at work which resulted in a twenty-minute break, it would affect his pace and productivity (Tr. 116-117; D.E. 9-4 at p. 31).

The vocational expert (VE) testified that Plaintiff could not do his past work and had no transferable skills.  The ALJ described a hypothetical person who could do sedentary, unskilled work, had no transferable skills, could have no contact with the public, and very little contact with coworkers (Tr. 117; D.E. 9-4 at p. 31).  The VE testified that such a person could do the job of document preparer, Dictionary of Occupational Title (DOT) code 249.587-018; an addressing clerk, DOT code 209.587-010; and a lens inserter in the optical industry, DOT code 713.687-026.  All of the jobs exist in significant numbers in the state and national economies.  The person would have to remain on task eighty percent of the time and not miss more than two days of work per month (Tr. 118; D.E. 9-4 at p. 32).

The lens inserter job would require constant handling and fingering.  The document preparer and address clerk jobs would require frequent handling and fingering, which means 66% of the time (Tr. 119; D.E. 9-4 at p. 33).  All of the described jobs would have quotas that needed to be met and if someone were unable to consistently meet the quota they would not be employable (Tr. 121; D.E. 9-4 at p. 35).

## ALJ DETERMINATION

In the decision issued on October 19, 2016, the ALJ found that Plaintiff met the insured status requirements until March 31, 2017 and that he had not engaged in substantial gainful activity since his alleged onset date of November 25, 2014. He further found that Plaintiff had the following severe impairments: polymyositis, hypothyroidism, depression, anxiety disorders, and a history of alcohol abuse in remission, but that none of his impairments met or medically equaled a listed impairment.

The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform sedentary work with the exception of no exposure to heat. He was limited to low-stress, unskilled work, with limited supervision, no contact with the public, and very little contact with coworkers. He then found that Plaintiff could not perform his past relevant work, but that he could perform the jobs described by the VE at the hearing and they existed in significant numbers in the national economy (Tr. 22-39; D.E. 9-3 at pp. 23-40).

Plaintiff objects to the ALJ's findings and argues the ALJ did not properly consider medical opinion evidence when determining Plaintiff's RFC and the Appeals Council failed to properly evaluate the additional medical evidence. Defendant counters that the ALJ properly considered the medical evidence in the record and that the Appeals Council properly considered the newly submitted evidence.

## LEGAL STANDARDS

### A.  Judicial Review

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*.;  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance.  *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012).  "Substantial evidence is more than 'a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Marcantel v. Chater*, 58 F.3d 637 at *1 (5th Cir. 1995)(not selected for publication)(citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo, or substitute its judgment for that of the Commissioner. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Conflicts of evidence are for the Commissioner rather than the courts to decide.  *Id.*  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors:  (1) objective medical evidence or clinical findings;  (2) diagnoses of examining physicians;  (3) subjective evidence of pain and disability as testified to by the claimant and others who

have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

### B. Residual Functional Capacity

A claimant's RFC is the most he can do in a work setting when his impairments and any related symptoms which result in physical and mental limitations are taken into consideration. 20 C.F.R. § 404.1545(a)(1). The adjudicator considers all of a claimant's medically determinable impairments, including those that are not "severe," and assesses whether he can meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(2)-(4). The RFC assessment is first used to determine whether a claimant can return to his past relevant work at Step 4 of the sequential evaluation. 20 C.F.R. § 404.1545(a)(5)(i). If the adjudicator makes a finding that the claimant cannot return to his past relevant work, the RFC assessment is used at Step 5 of the sequential

evaluation process to decide if the claimant can adjust to any other work that exists in the national economy.  20 C.F.R. § 404.1545(a)(5)(ii).

### C.  Weighing Medical Opinions

### 1.  Treating Source

Under the regulations, the Commissioner is supposed to give controlling weight to the opinion of a treating source if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2) and 404.927(c)(2).

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. . . .  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

If controlling weight is not given to a treating source, the following factors are considered in deciding the weight to give to any medical opinion:   (1) Examining relationship, with more weight given to the opinion of a source who has examined a claimant than to the opinion of a non-examining source; (2) Treatment relationship, with a focus on the length of the relationship, the frequency of examinations, and the nature and extent of the treatment relationship; (3) Supportability by relevant evidence, including medical signs and laboratory findings; (4) Consistency with the record as a

whole; (5) Specialization; and (6) Other relevant factors, including the amount of understanding an examiner has of disability programs and their evidentiary requirements and the extent to which a source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527(c) and 404.927(c).

> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for opinions, than are required of treating sources.

SSR 96-6P, 1996 WL 374180 at *2. (S.S.A)[5]

## 2. Consultative Examiner

In addition to opinions of treating physicians, opinions from examining physicians must be considered. *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017). Generally, more weight is given to the opinion of a medical professional who has examined a claimant than to one who has not. *Id.* (citing 20 C.F.R. § 404.1527(c). "And fundamentally, '[t]he ALJ cannot reject a medical opinion without an explanation.'" *Id.* (quoting *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000). *See also Accord Wright v. Colvin*, 789 F.3d 847, 852-53 (8th Cir. 2015)(opinions of examining medical professionals are given more weight than non-examining medical professionals) and *Gudgel v. Barnhart*, 345 F.3d 476, 470 (7th Cir. 2003)(ALJ can reject examining

---

[5] Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance. The Fifth Circuit has frequently relied upon the rulings in evaluating ALJ decisions. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice).

### 3. State Agency Medical and Psychological Consultants

State agency consultants are highly qualified physicians and psychologists who are experts in evaluating medical issues in Social Security disability claims.  They are members of a team that make determinations of disability at the initial and reconsideration levels of the administrative review process.  SSR 96-6P, 1996 WL 374180 at *2.  They consider the evidence and make findings of fact on the medical issues, including the existence and severity of a claimant's impairments and symptoms, whether the impairments meet or equal a listed impairment, and the claimant's RFC.  *Id.*

The regulations require that ALJs and the Appeals Council consider findings of fact made by state agency consultants as the opinions of non-examining physicians and psychologists.  They are not bound by the opinions, but they may not ignore them and must explain the weight given to the opinions in their decisions.  *Id.*  The opinions of the state agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering factors such as supportability of the opinion in the evidence, consistency with the record as a whole, including other medical opinions, and any explanation given by the consultant.  *Id.*  In appropriate circumstances, opinions from state agency consultants may be entitled to greater weight than the opinions of treating or examining sources.  For example, a consultant's opinion may be given greater weight if it is based on a review of a complete case record that includes a medical report from a specialist in the claimant's particular impairment which provides more detailed

and comprehensive information than what was available to the claimant's treating source. *Id.* at *3.

## **DISCUSSION**

### A.  Medical Opinions

In this case, several medical professionals stated that Plaintiff had reduced grip strength in both hands.  The treating physician who saw Plaintiff in 2012 reported that he could not grip or use a can opener and it was noted that he could not close his hands (Tr. 391; D.E. 9-9 at p. 9).  Treating physician Dr. Hirschfield noted that Plaintiff had muscle weakness, mild contractures in both hands and moderate pain with motion (Tr. 474-475; D.E. 9-10 at pp. 7-8).  It was also the doctor's belief that Plaintiff had no ability to use his hands, fingers, or arms during an eight-hour workday (Tr. 466; D.E. 9-9 at p. 84).  At the internal medical consultative examination, Dr. Liles noted that Plaintiff had contractions of both fifth fingers and decreased grip strength bilaterally (Tr. 461; D.E. 9-9 at p. 79).

In addition, a state agency medical consultant who reviewed the medical evidence at the initial determination assessed Plaintiff's RFC and determined that his ability to engage in gross manipulation was limited and that he could only do jobs requiring occasional bilateral manipulation due to poor grip strength (Tr. 134-135, 148-149; D.E. 9-5 at pp. 10-11, 24-25).  When making the reconsideration determination, a different state agency medical consultant found that Plaintiff was limited in his ability to engage in both gross and fine manipulation and was limited to jobs requiring frequent (as opposed to constant) bilateral manipulation due to poor grip strength (Tr. 165, 182; D.E. 9-5 at pp.

41, 58).  Both medical consultants also found that Plaintiff could do light work with additional limitations, including manipulative limitations.

In the ALJ's decision, he disregarded all of the opinions by medical professionals that Plaintiff has decreased grip strength and pain in his hands in favor of the ME's opinion that Plaintiff had no manipulative limitations.  The finding is significant because two of the representative jobs the ALJ determined Plaintiff can do involve frequent handling and fingering and one, the lens inserter, involves constant handling and fingering.  If Plaintiff's ability to grip and grasp is limited, he would not be able to do the job of lens inserter and would possibly be disqualified from the jobs of document preparer and address clerk.

A review of the evidence shows that the ALJ's determination regarding Plaintiff's grip strength is not supported by substantial evidence.  The ALJ discounted Dr. Hirschfield's opinion regarding Plaintiff's ability to use his hands at work finding that it was largely based on Plaintiff's subjective statements.  However, Plaintiff has a diagnosis of polymyositis which was done by muscle biopsy and is consistent with a lack of mobility and grip strength.  Also, Dr. Hirschfield observed mild contractures in both of Plaintiff's hands.  In addition, Dr. Hirschfield's finding is consistent with the record as a whole, as Plaintiff has consistently reported a lack of grip strength which results in his dropping objects.

The ALJ gave substantial weight to Dr. Liles's assessment of Plaintiff's limitations, with the exception of Dr. Liles's finding that Plaintiff had a limited ability to grasp, where he gave greater weight to the ME's opinion that Plaintiff had no limitations on

grasping.  He did so because he found no objective evidence of sustained limitations in the claimant's ability to grasp or grip (Tr. 34; D.E. 9-3 at p. 35).  However, Dr. Liles apparently tested Plaintiff's grip strength (Tr. 79; D.E. 9-9 at p. 79).  The ME stated that he did not credit a finding of reduced grip strength based on one visit where the patient was asked to grasp the doctor's fingers because a person might not put in an effort to grip strongly on the test and the ALJ apparently adopted the ME's reasoning.  But nothing in the record indicates that Plaintiff did not give full effort on the test and a conclusion that he did not do so is not based on substantial evidence.  Thus, substantial evidence does not support the ALJ's rejection of Dr. Liles's finding.

The ALJ found that the opinions of the state agency medical consultants were well supported by the evidence available at the time they issued them, but that later evidence showed that Plaintiff was limited to less than light work and thus he gave their opinions little weight.  The ALJ did not discuss what effect the later evidence had on the consultants' finding that Plaintiff had limited grip strength and gave no explanation for rejecting their findings regarding grip strength (Tr. 36; D.E. 9-3 at p. 37).

The reasons the ALJ gave for giving the ME's determination great weight and discounting the opinions of the other doctors was that the ME was board certified in internal medicine, was a disability medical expert, and had knowledge of the disability program and regulations.  However, given that the regulations make clear that the opinions of treating and examining physicians are to be given greater weight than that of a non-examining physician, the ME's background, without more, is not substantial evidence on which to base a conclusion that his opinion is entitled to greater weight.

20 / 25

Moreover, the state agency medical consultants also are disability medical experts with knowledge of the disability program and regulations and they both found Plaintiff to have reduced grip strength based on the evidence in the record.

Finally, the ALJ stated that Plaintiff's daily activities reveal a significantly greater functional ability than he alleged.  The ALJ cited evidence that Plaintiff takes care of his personal grooming and hygiene, prepares simple meals, does laundry, washes dishes, reads books, watches television, goes outside, shops in stores, and manages his finances as evidence that has a greater functional ability than alleged.  However, Plaintiff testified at the hearing that he has trouble opening things on days his symptoms are more pronounced, has difficulty buttoning a shirt, has to use a tool to open jars and needs to use both hands to pick up a gallon of milk.  When Plaintiff completed function reports on January 8, 2015 and June 7, 2015 he stated that he was constantly dropping things, all his meals are microwaveable, anything involving his hands is difficult, and he has trouble using eating utensils and counting change  (Tr. 326-330, 333, 348-349, 352, 355; D.E. 9-8 at pp. 36-40, 43, 58-59, 62, 65).  The evidence does not support the ALJ's conclusion that Plaintiff's daily activities show that he does not have manipulative limitations.

A thorough review of the record indicates that the ALJ's determination that Plaintiff does not have reduced grip strength is not supported by substantial evidence. Because all of the representative jobs the ALJ found that Plaintiff could do require frequent or constant handling, the determination that Plaintiff is not disabled is not supported by substantial evidence.  Accordingly, it is recommended that Plaintiff's case

be remanded to the Commissioner for further consideration of the medical opinions in his case.

### B.  Evidence Presented to Appeals Council

Plaintiff also argues that the Appeals Council failed to properly consider the evidence that was submitted in connection with the request for review of the ALJ decision.  After the ALJ found that Plaintiff was not disabled, he sought review of that decision with the Appeals Council and submitted medical evidence produced after the hearing.  The evidence consisted of records from two visits to James H. Wild, M.D., a physician specializing in arthritis and osteoporosis.  Plaintiff saw Dr. Wild on October 29, 2016 and his main complaint was that he became short of breath with activities such as yard work.  He said he had an unproductive cough and was sometimes short of breath when chewing food.  He complained of loss of appetite, dry mouth, palpitations, nausea, diarrhea, problems with urination, dizziness, joint and neck pain, anxiety, problems with thinking, memory, sleeping, and sexual function (Tr. 13; D.E. 9-3 at p. 14).

His face was described as "a little cushingoid."  He was not in respiratory stress during the visit.  He had telangiectasias[6] on both palms.  He had scars on his fingers consistent with longstanding Raynaud's syndrome; calluses and fissures on the flexor surface of his thumbs; a nodule in the skin of the flexor thumb base on the right side; and flexion contractures of the PIP joint of the small fingers in both hands (Tr. 14; D.E. 9-3 at p. 15).

---

[6] Telangiectasias are permanently dilated small blood vessels that appear as a group of red lines. https://www.mayoclinic.org/diseases-conditions/crest-syndrome/multimedia/telangiectasia/img-20008239lines (last viewed May 7, 2018).

Plaintiff had normal strength of neck flexion and the strength of his shoulder abductors was 5/5.  He had no problems getting up from a chair or on and off the exam table.  He was able to do a deep knee bend and come up without assistance.  None of his joints were swollen.   Dr. Wild diagnosed Plaintiff with possible scleroderma with Raynaud's syndrome, pulmonary fibrosis, and myositis.  He recommended a visit to a pulmonologist (*Id.*)

Plaintiff returned to Dr. Wild on December 7, 2016, still complaining of shortness of breath.  His lab tests were essentially normal but he had not yet seen the pulmonologist.  He had been to the emergency room the previous month with shortness of breath with was treated with a short increase in prednisone.  His muscles were strong. (Tr. 12; D.E. 9-3 at p. 13).

Under the regulations, the Appeals Council will review additional evidence when it is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the case.  20 C.F.R. § 404.970.  In this case, the Appeals Council stated that it looked at the records, but did not consider them because they were "about a later time" and did not affect the decision about whether Plaintiff was disabled beginning on or before the date of the ALJ hearing (Tr. 2; D.E. 9-3 at p. 3).

The ALJ issued his decision on October 19, 2016 and the records were dated October 26, 2016 and December 7, 2016.  Although Dr. Wild examined Plaintiff after the ALJ hearing, he refers back to Plaintiff's diagnoses of polymyositis and Raynaud's syndrome.  His description of Plaintiff's hands is consistent with both diagnoses.  While

the doctor considered some additional diagnoses for Plaintiff, all of the symptoms on which he based the diagnoses appeared well before the ALJ hearing.  Because it is recommended that this case be remanded to the Commissioner for further evaluation of the medical opinions, it is further recommended that the Commissioner be ordered to review Dr. Wild's records along with the other medical evidence on remand.

## RECOMMEDATION

Based on the foregoing, it is respectfully recommended that Plaintiff's motion to reverse the determination of the Commissioner and remand his case for additional administrative proceedings (D.E. 11) is GRANTED.  The Commissioner's determination that plaintiff is not disabled is not supported by substantial evidence and should be VACATED.  It is further recommended that Plaintiff's case be remanded to the Social Security Administration so that a proper assessment can be made of the medical opinions in the record, including Dr. Wild's, and in turn, of Plaintiff's residual functional capacity to do work.  This recommendation for remand is made pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Respectfully submitted this 10th day of May, 2018.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(*en banc*).